IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RACHEL CIVITARESE, | ) | CASE NO. 1:17-CV-85 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Rachel Civitarese ("Civitarese") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 12.

For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

## I. Procedural History

Civitarese protectively filed an application for DIB on June 6, 2012, alleging a disability onset date of February 10, 2012. Tr. 14, 77. She alleged disability based on the following: major depression, anxiety and degenerative disc disease. Tr. 198. After denials by the state agency initially (Tr. 89) and on reconsideration (Tr. 90), Civitarese requested an administrative hearing. Tr. 125. A hearing was held before Administrative Law Judge ("ALJ") Traci M. Hixon on March 13, 2015. Tr. 29-76. In her August 21, 2015, decision (Tr. 14-23), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Civitarese can perform, i.e. she is not disabled. Tr. 21. Civitarese requested review of the ALJ's

decision by the Appeals Council (Tr. 9) and, on November 14, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 3-5.

## II. Evidence

### A. Personal and Vocational Evidence

Civitarese was born in 1980 and was 32 years old on the date her application was filed. Tr. 158. She has a GED and last worked in February 2012 as a teller supervisor at a bank. Tr. 34, 42.

### B. Relevant Medical Evidence[1]

On August 2, 2011, Civitarese saw her general practitioner, Philip Gigliotti, M.D., complaining of severe low back pain that radiated into her left upper leg and thigh after riding on a motorcycle. Tr. 352, 368. She had no numbness or weakness and she also reported that she "still" had pain in her upper back. Tr. 368. Dr. Gigliotti diagnosed her with lumbar radiculopathy with left leg weakness and ordered an MRI. Tr. 368.

On January 25, 2012, an MRI of Civitarese's lumbar spine showed a small right central disc herniation at L5-S1 with "[n]o foramen compromise or thecal sac stenosis" but an "impression on the dural sac." Tr. 392. An MRI of her cervical spine taken the next day showed a "large broad-based disc herniation at the C5-C6 levels ... that displaces subarachnoid fluid and causes impression on the ventral margin of the spinal cord." Tr. 393.

On February 15, 2012, Civitarese saw Ajit A. Krishnaney, M.D., at the Cleveland Clinic spinal surgery department for a follow-up visit. Tr. 240. Civitarese reported that, a week after her prior visit on February 3, 2012, she woke up with very severe exacerbation of her neck pain that radiated into her right middle, ring, and little fingers. Tr. 240. The pain was so severe she

---

[1] Civitarese only challenges the ALJ's findings regarding her physical impairments. Accordingly, only the medical evidence relating to Civitarese's physical impairments are summarized and discussed herein.

could not sleep or work.  Tr. 240.  She was taking Vicodin and did not experience relief from her dexamethasone pack or Neurontin and was interested in pursuing epidural steroid injections or surgery.  Tr. 240.

On February 17, 2012, Civitarese saw Fady Nageeb, M.D., who gave her an epidural cervical steroid injection.  Tr. 237.  She listed her pain as ranging from a 2-10/10 and that day as a 9.  Tr. 237.  She had been prescribed Vicodin, Oxycodone, Percocet, Gabapentin, and dexamethasone.  Tr. 239.  Dr. Nageeb recommended further injections as needed if Civitarese experienced relief from that day's injections.  Tr. 239.

The next day, Civitarese presented to Cleveland Clinic's Fairview Hospital due to vomiting, neck pain, headache, and leg pain.  Tr. 248.  Her pain was 10/10 and she reported having had an injection the day before.  Tr. 248.  She underwent another cervical spine MRI to rule out an epidural hematoma or fluid collection.  Tr. 251.  The MRI showed no hematoma or fluid collection and a disc osteophyte (bone spur) prominent on the right that mildly indented the right side of the spinal cord at C5-6, causing moderate stenosis.  Tr. 252.  She also had a reversal of the lordosis at C5-6.  Tr. 251.  There was no cord compression.  Tr. 252.  Civitarese requested she be transferred to the Cleveland Clinic Main Campus and she was transferred there on February 20.  Tr. 249.

On February 21, 2012, Dr. Krishnaney performed an anterior cervical discectomy and fusion and placement of anterior plate on Civitarese at C5-6.  Tr. 297-298, 291.

On April 13, 2012, Civitarese saw Dr. Krishnaney for follow-up visit.  Tr. 279.  Civitarese stated that she "ha[d] been doing pretty well since the surgery."  Tr. 279.  Dr. Krishnaney's impression was that she was improving and had a left rotator cuff strain.  Tr. 279.  He ordered a cervical x-ray to ensure Civitarese's surgical hardware was in place and

recommended physical therapy for her neck and left shoulder. Tr. 279. A cervical x-ray showed intact surgical hardware. Tr. 274.

On April 16, 2012, Civitarese started physical therapy and saw Amanda Albernathy, PT, DPT. Tr. 272. Civitarese reported that she was on short-term disability and was to return to work on April 24. Tr. 272. Her status was "improving." Tr. 272. Her pain was in the left side of her neck and shoulder, was shooting, aching and constant, at that time 5/10 and ranging from 2/10 to 8/10. Tr. 272. Her pain got worse as the day progressed. Tr. 272. She had trouble dressing, grooming, lifting her 2-year-old, sleeping on her left side, and she was unable to coach basketball. Tr. 272. Lifting, reaching and turning her head made her pain worse. Tr. 272. Upon exam she had "major" loss of motion in her cervical spine upon retraction, protraction and rotation, and a loss of 21 degrees upon flexion, 25 degrees upon extension, and, with side bending, 20 degrees (right) and 19 degrees (left). Tr. 274. Abernathy assessed Civitarese with a "severely limited cervical range of motion and decreased strength throughout bilateral [upper extremities]." Tr. 276. She had "decreased knowledge regarding her condition and how to manage it." Tr. 276.

On April 23, 2012, Civitarese reported to Abernathy that her positioning at night with a towel roll was helping and that she can already notice a difference. Tr. 268. She was not waking up as much at night. Tr. 268. She was doing well with her stretches but still felt that she wasn't moving her neck better. Tr. 268. Her pain had improved to 3/10 and she felt looser and more normal. Tr. 368. Abernathy added shoulder exercises to her home exercise program. Tr. 268.

On May 25, 2012, Civitarese returned to Dr. Krishnaney. Tr. 264. She stated that she continued to have pain in her left upper arm and the middle of her back when she turned her head to the left. Tr. 264. Recently, she noticed that her head started shaking when she turned her

head to the left. Tr. 264. Dr. Krishnaney recommended a cervical MRI to rule out adjacent level disc herniation and referred her to be assessed for rotator cuff syndrome. Tr. 264. On June 4, Civitarese saw Dr. Gigliotti and stated that she had had her surgical follow up but wanted a second opinion. Tr. 374. She reported no radiation, no weakness, and complained of right flank pain. Tr. 374. She was taking Vicodin regularly and was on Butrans pain patches. Tr. 374. Dr. Gigliotti doubled her Butrans and refilled her Vicodin. Tr. 374.

On August 2, 2012, Michael Farber, M.D., wrote a letter to Philip Gigliotti, M.D., summarizing a discussion in which Dr. Gigliotti confirmed mechanical neck pain, little improvement of radiculopathy and discomfort despite surgery, and reiterated that they "agreed that subjective complaints appear to be out of proportion to the degree of objective data" and "that there may be a psychological component that is contributing to subjective complaints." Tr. 420-421. They further "agreed that until [additional] MRI results are completed, claimant should likely be restricted from heavy duty lifting as defined by DOL." Tr. 420-421.

On September 7, 2012, Dr. Gigliotti wrote a letter saying that Civitarese has cervical disc disease which may have been made worse by lifting more than ten pounds. Tr. 422. On October 3, 2012, Dr. Gigliotti wrote a letter certifying that Civitarese suffered a neck injury "which caused severe neck pain" and that daily heavy lifting of coin boxes could have made her neck injury worse."[2] Tr. 430.

On September 21, 2012, Civatarese began treatment at Advanced Comprehensive Pain Management and saw Sherif Salama, M.D. Tr. 313-318. Civitarese complained of neck pain radiating to her bilateral shoulders and arms. Tr. 313. She was still having a lot of pain after her fusion surgery. Tr. 313. She reported having been injured at work from lifting a lot of

---

[2] Civitarese was required to lift and carry coin boxes for her job at the bank. Tr. 43-44.

shipments and her employer was fighting her workers' compensation claim. Tr. 313. She reported having injections in her neck in August but that these did not help her pain at all; nor did physical therapy. Tr. 313. Her pain was dull, shooting and stabbing and was worse in the morning. Tr. 313. Her pain was 8/10 and the worst it had been the past few weeks was 10/10. Tr. 313. Driving and movement made her pain worse and pain caused her to have problems sleeping. Tr. 313. Upon exam, she had a normal range of motion in her neck and head, moderate tenderness bilaterally upon palpation along the cervical facets from C4 to C7, and a decreased flexion of the cervical spine, with both rotations to the left and right limited 10 degrees due to pain. Tr. 315 -316. She had bilateral tenderness in her trapezius muscles, normal range of motion in her left shoulder with no joint or muscle tenderness, and 4/5 left shoulder strength and abduction. Tr. 316. She had a normal range of motion in her wrists, hands and fingers and normal grip strength. Tr. 316. Her thoracic and lumber spine exam were both normal as were examination of both lower extremities. Tr. 316. Dr. Salama diagnosed Brachial neuritis/radiculitis, NOS; cervical radiculitis; radicular syndrome of upper limbs; post-laminectomy syndrome; and cervical spondylosis with myelopathy. Tr. 317. He prescribed Lyrica and Vicodin. Tr. 318.

On October 19, 2012, Dr. Salama administered median branch nerve blocks to the C4-C5, C5- C6, and C6-C7 levels of Civitarese's cervical spine. Tr. 319-320.

On November 7, Civitarese returned to Dr. Salama reporting that the injections made her pain worse and that she was in bed for a few days afterwards with a severe headache. Tr. 309. She complained of neck pain that was moving to her left side more and tingling in her bilateral arms. Tr. 309. Her pain was made worse with movement and relieved by medications. Tr. 309. She reported 0% improvement after her surgery and her pain was 7/10. Tr. 309. Dr. Salama

commented that Civitarese was "a lot better" after her last injection because she had no right-sided neck pain. Tr. 312. He listed her diagnoses (Brachial neuritis/radiculitis, NOS; cervical radiculitis; radicular syndrome of upper limbs; post-laminectomy syndrome; and cervical spondylosis with myelopathy) as improved. Tr. 312. He educated Civitarese on neck strain exercises. Tr. 312.

On December 5, 2012, Civitarese reported to Dr. Gigliotti that because her insurance lapsed she was unable to see Dr. Salama. Tr. 381. She reported that she had more pain and Dr. Gigliotti refilled her medication because she could not get medication from Dr. Salama as she had been. Tr. 381, 312.

On October 21, 2013, she reported to Dr. Gigliotti that she had more neck pain. Tr. 482.

On February 19, 2014, Civitarese saw Dr. Gigliotti complaining of more pain in her neck and lower back. Tr. 486-488. She had been trying to take Oxycodone but with minimal improvement. Tr. 486. Upon exam, she had a normal gait and a normal motor exam in both arms and legs. Tr. 488.

On May 16, 2014, Civitarese returned to Dr. Gigliotti stating that she had fallen backwards several days prior and had developed more neck pain. Tr. 501. Her pain occasionally radiated into her eye. Tr. 501.

On July 15, 2014, Civitarese reported to Dr. Gigliotti that her neck pain was better but that she was getting more low back pain. Tr. 507. She was taking Oxycodone fairly regularly. Tr. 507. On July 21, Civitarese complained to Dr. Gigliotti that she got headaches when she took her Oxycodone. Tr. 510. She did not experience this with Vicodin. Tr. 510. She reported having been diagnosed with migraines a few years prior. Tr. 510. Upon exam, she had no tenderness in her spine, 5/5 motor strength, normal sensation, and normal gait. Tr. 512.

On September 12, 2014, Civitarese returned to Dr. Gigliotti and reported continued severe pain in her neck and lower back that radiated into her left arm and left leg, respectively. Tr. 524. She had obtained insurance and planned on seeing consultants. Tr. 524.

On October 8, 2014, Civitarese returned to Dr. Gigliotti stating that, for the past two days, she had had more neck pain and had been unable to sleep or move. Tr. 532. Her neck hurt when she moved her arms. Tr. 532. She had an appointment with neurologist Dr. Rheiw in two weeks. Tr. 532. Dr. Gigliotti increased her oxycodone from 10 mg every six hours to 15 mg every six hours. Tr. 535.

On October 11, 2014, Civitarese had an MRI of her cervical spine. Tr. 556. The interpreting radiologist, James Zelch, M.D., wrote:

> There is evidence of signal loss between the fused segment (C5/6) as would be expected after anterior cervical fusion. The fusion appears solid and presents a smooth interface with the ventral aspect of the subarachnoid fluid column.
>
> There is evidence of a right central disc herniation at C4-5. All other aspects of the study are normal. Each foramen is well defined and clear (no nerve root compression). The soft tissues adjacent to the cervical spine are normal.
>
> > CONCLUSION: Right central disc herniation at C4-5.
> > Satisfactory post-op appearance of the C 5/6 ACF [anterior cervical fusion].
> > The study of 2012 diagnosed a disc herniation at C5-6 which has been surgically corrected. The disc herniation at C4-5 there is a recent finding.

Tr. 556.

On October 21, 2014, Civitarese reported that the increase in oxycodone had helped her pain tremendously; she was more mobile and felt much better. Tr. 536. She reported feeling weakness in her left arm. Tr. 536.

On November 9, 2014, Civitarese completed a self-evaluation of her functioning prior to seeing Richard Rhiew, M.D. Tr. 469. She indicated that her pain was mostly 10/10 and did not change very much, she could lift very light weights, she had headaches almost all the time, and

she could "hardly drive my car at all because severe pain." Tr. 469. She also wrote that she should probably not drive a car at all because she had almost been in a few accidents. Tr. 469. Because of severe neck pain, she could not read as much as she wanted and could "hardly do any recreational activities." Tr. 469. Based on the corresponding numerical ratings for each of her answers, she received a disability index score of 80%.[3] Tr. 469.

On November 10, 2014, Civitarese met with Dr. Rhiew. Tr. 470-475. Dr. Rhiew did not believe that further surgery would significantly improve her dominant symptom of neck pain. Tr. 470. He reviewed her MRIs and summed these up as showing previous fusion surgery, disc herniation at C4-5 and no nerve compression. Tr. 473. He detailed her condition as having been somewhat improved after her surgery but not completely; noted her treatment of opioid medications, injections, physical therapy, and surgery; and recommended an EMG, pain management, an x-ray to ensure proper surgical hardware position and a possible second opinion. Tr. 473, 475. Dr. Rhiew observed that she had symptoms that did not correlate to the objective findings. Tr. 473, 475.

On February 2, 2015, Civitarese saw Dr. Gigliotti. Tr. 548. Her chief complaint was depression, explaining that her Cymbalta and Klonopin no longer seemed to be working. Tr. 548. She continued to have pain in her neck and lower back. Tr. 548.

On February 16, 2015, Civitarese returned to Dr. Gigliotti. Tr. 551. Her chief complaint was anxiety; she also complained of episodes of depression, continued neck pain, and more problems with her left arm and hand. Tr. 551. She had brought a disability form to be completed. Tr. 551. Upon exam, she had no spinal tenderness, 5/5 motor strength in her right arm and 4/5 in her left arm, normal sensation and a normal gait. Tr. 553.

---

[3] Plaintiff states, "This score corresponds with the rating of "crippled"[Fairbank JCT & Pynsent, (2000) The Oswetry Disability Index . Spine 25(22):2940-2953]." Doc. 14, p. 9.

**C. Medical Opinion Evidence—Treating Physician**

On February 16, 2015, Dr. Gigliotti filled out a check box Physical Capacities Evaluation on behalf of Civitarese. Tr. 557-558. Dr. Gigliotti opined that Civitarese can sit for three hours per day, stand for one hour per day, and walk for three hours per day (both at one time without interruption and as a total in an eight-hour day); lift and carry zero to five pounds occasionally and never more than five pounds; and occasionally bend or crawl but never squat, climb, or reach above shoulder level. Tr. 557-558. She cannot use her left hand for simple grasping, pushing, pulling, or fine manipulation and could not push or pull with her right hand. Tr. 557. She was moderately restricted in her ability to be exposed to marked temperature and humidity changes. Tr. 559. The form asked for objective findings to support the opinion but Dr. Gigliotti left that section blank. Tr. 559.

**D. Testimonial Evidence**

**1. Civitarese's Testimony**

Civitarese was represented by counsel and testified at the administrative hearing. Tr. 31-66. She testified that she lives with her fiancé and their three children, ages 17, 13 and 5. Tr. 33. She drives around her neighborhood, for instance to the bank or the store across the street, but she cannot drive long distances and her fiancé drove her to the hearing. Tr. 33-34. While driving, she has been in two accidents backing into people because she can't turn her head that well when backing. Tr. 34.

As for things she does around the house, Civitarese explained that she does not prepare meals like she used to. Tr. 34. It depends on the day; she has very bad pain days, days when she does not get enough sleep, and gets bad headaches "because of nerve problems and stuff." Tr. 34. On days when she cannot cook something, her fiancé will cook or they will order out. Tr.

35.  She can load a dishwasher and use a vacuum cleaner.  Tr. 35.  The house has steps that she needs to take to go to her bedroom or bathroom.  Tr. 35.  She can do laundry but her family has to carry it up and down the steps for her.  Tr. 35.  She goes grocery shopping and her fiancé usually goes with her "because I can't lift, like, the waters, things like that."  Tr. 36.  She never pushes the grocery cart.  Tr. 36.  She can maintain her personal care and hygiene but sometimes needs help washing her hair or blow drying it.  Tr. 36.  She likes to spend time outside with her kids.  Tr. 36.  She used to scrapbook a lot but can no longer do so.  Tr. 37.  She can make it to her children's school to meet with teachers but she cannot attend sporting events because it is uncomfortable to sit in the bleachers.  Tr. 39.

On a typical day, Civitarese stated that she gets up around 6:00 a.m.  Tr. 39.  She takes her medications, gets a cup of coffee, lies on the couch, and monitors the older kids as they get ready for school.  Tr. 39.  Her younger child does not go to school but goes to her neighbor's house where "he has friends and stuff."  Tr. 40.  Her older son walks the younger one to the neighbor's house.  Tr. 40.  On a day she does not feel as bad, pain-wise, her youngest child will stay home with her.  Tr. 40.  After her children have left the house, it takes a while for her to get moving: "my energy level's awful."  Tr. 40.  She has no motivation for anything anymore.  Tr. 40.  She tries to get dressed sometimes and it takes her a long time to do that.  Tr. 40.  She may pick up a couple of things here and there around the house and then she lies down and watches television while propped up on pillows.  Tr. 40.  She gets uncomfortable sitting and standing "and stuff"; she gets a burning pain.  Tr. 40.  She also gets fidgety if she sits too long.  Tr. 52.  She makes phone calls if she needs to and doesn't go "anywhere."  Tr. 40.  She has a computer but mostly uses her phone if she has to do something like pay a bill or check her bank account.  Tr. 40.  She is alone during the day and naps between 1 to 2 1/2 hours, depending on how awful

her sleep was the night before. Tr. 41. Sometimes she runs errands around the neighborhood, to two nearby stores and the bank. Tr. 41. She does not drive far because she can't check her blind spot while driving. Tr. 42.

Civitarese explained the work she performed as a teller supervisor and the bank. Tr. 42-43. She monitored and maintained the vault, made the schedule for the tellers, coached sales, etc. Tr. 42. She had to lift coin boxes every day, multiple times a day. Tr. 43-44. The coin boxes easily weighed more than 20 pounds but less than 50 pounds. Tr. 44. She also had to do a lot of overhead reaching. Tr. 44. She left her job because of her injury. Tr. 44. She had a worker's compensation claim that was denied; it was found that she had degenerative disc disease and her lifting duties at the bank, while perhaps irritating her problem, did not cause it. Tr. 45. Prior to her job at the bank she worked as a telemarketer. Tr. 46. When performing that job, she remained seated the entire time. Tr. 46. She also had worked at a day care center taking care of babies and constantly lifted more than 20 pounds. Tr. 48.

Civitarese explained the history of her neck injury. Tr. 49. It happened suddenly while she was working at the bank. Tr. 49. A few days later it was worse—when she drove and hit a bump with her car it was excruciating—and she "finally" went to her doctor, Dr. Gigliotti. Tr. 49. They took an MRI and she learned that she had a herniated disc at C5 and 6. Tr. 49. She got an injection; the next day she had to go to the hospital and they did fusion surgery. Tr. 49. She thought that everything would be okay after that but the pain was "crazy still." Tr. 49. Nothing seemed to get better. Tr. 49. She was constantly visiting her doctor or the surgeon. Tr. 49. Then she lost her insurance and was without it for about 1 or 1 ½ years. Tr. 50, 63. She has had a total of three injections but she can't get them anymore because she experiences excruciating head pain the next day. Tr. 50. She started increasing her pain medications. Tr. 50. Her life has

changed.  Tr. 50.  As soon as she wakes and tries to sit like a normal person, "tears, because the pain which is the worst part of this whole thing..."  Tr. 51.  Her normal pain is what she is used to everyday.  Tr. 51.  One day she wakes up and she can't move, and her fiancé or daughter has to stay home to help her; she can't even get out of bed and she remains bedridden for up to two weeks.  Tr. 51.  It's "crazy" that she is taking her medications, which are strong.  Tr. 51.  She twitches a lot, especially her left eye, and sometimes her body jolts, especially when she is sleeping.  Tr. 51.  Also, some days she can't grab things; one time she dropped a gallon of milk out of the fridge.  Tr. 51.  The day before the hearing she had no feeling in three of her toes.  Tr. 52.  Sometimes she has no feeling in her left shoulder.  Tr. 53.  She has to have a nerve study done to see if her nerves can be fixed.  Tr. 52.  She doesn't sleep at night and always has to get up and take pain medication in the middle of the night.  Tr. 52.  She also has to adjust her position a lot, moving pillows around.  Tr. 53.  Her mind races when she tries to fall asleep.  Tr. 53.  She also has lumbar spine issues that "kick in" when she does "standing stuff" but those are not so severe.  Tr. 54.

Civitarese takes oxycodone for pain; on mild pain days it helps "perfectly."  Tr. 54.  But on days that she struggles and has a pretty bad day, which she has more frequently than better days (4 bad days a week), her medication has never taken her pain away fully.  Tr. 54, 65.  She also takes tramadol "in between sometimes" when her pain is really bad.  Tr. 57.  Her medications make her feel groggy, constantly tired, like she wants to pass out all the time, give her "awful" memory loss, and she gets headaches a lot.  Tr. 57-58.

Civitarese testified that she could probably lift and carry three pounds, and even that much weight would start to "annoy" her neck and back.  Tr. 58.  She can no longer carry a purse or wear high heels.  Tr. 58.  She can stand for maybe an hour before she needs to sit down and

she prefers sitting to standing. Tr. 58. If she has to wait in line at the pharmacy for an hour and there is a seat she will sit. Tr. 58. She can sit for about 20 or 30 minutes before she will lie back on propped-up pillows. Tr. 59. She can walk for about an hour. Tr. 59. Her difficulty is on her left side although her doctors are surprised because she has a bulging disc on the right side of her cervical spine. Tr. 60. They think it might be something wrong with her fusion surgery and now they want to take an x-ray instead of an MRI. Tr. 60-61. They think it is something that may have happened after she had her October MRI. Tr. 61. Also, she does not have mobility in her neck due to her fusion surgery, she can only turn it so far, and that is why she does not like to drive anywhere. Tr. 62-63.

Civitarese stated that she has problems reaching overhead always and less of a problem reaching "on more subtle down days." Tr. 65. Her pain is made worse by lying down without being propped up, sitting, and standing for certain amounts of time. Tr. 66. She can't do anything physical like play with her child at the playground and turning her head hurts. Tr. 66.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Mark Anderson testified at the hearing. Tr. 66-74. The ALJ discussed with the VE Civitarese's past work as a teller supervisor, telemarketer and child care provider. Tr. 67-69. The ALJ asked the VE to determine whether a hypothetical individual with Civitarese's age, education and work experience could perform her past work if the individual had the following characteristics: can lift and carry 10 pounds occasionally, stand and walk for 2 hours and sit for 6 in an 8-hour workday, would need a sit/stand option every hour for about 5 minutes but would not leave the workstation during that time, can balance, can occasionally climb ramps and stairs but not ladders, ropes or scaffolds, can occasionally stoop, kneel, crouch and crawl, can frequently reach in front and occasionally overhead, cannot push or pull with the

non-dominant, left upper extremity, can handle, finger and feel, and can have no exposure to hazardous conditions such as unprotected heights, moving machinery or extreme cold temperatures. Tr. 70. The VE answered that such an individual could perform Civitarese's past relevant work as a telemarketer. Tr. 70. The ALJ asked the VE if his answer would change if the ALJ further limited the hypothetical individual to occasional overhead reaching with the dominant arm but no overhead reaching with the non-dominant arm and only occasionally reaching to shoulder height. Tr. 70-71. The VE stated that his answer would not change. Tr. 71.

Next, the ALJ asked the VE if the hypothetical individual described in the first hypothetical could still perform the job of telemarketer if that individual had the following, additional limitations: can perform simple, routine tasks with simple, short instructions, make simple decisions, have few workplace changes, and have only superficial interaction (no negotiation or confrontation) with co-workers, supervisors, and the public. Tr. 71. The VE answered that such an individual could no longer perform work as a telemarketer. Tr. 71. The ALJ asked the VE if such an individual could perform any other work and the VE responded that the individual could perform work as a bonder (2,500 regional jobs; 10,000 Ohio jobs; 110,000 national jobs), touchup screener (1,700 regional jobs; 5,200 Ohio jobs; 158,000 national jobs), and heat sealer (2,000 regional jobs; 16,000 Ohio jobs; 180,000 national jobs). Tr. 72. The ALJ asked if the VE's answer would change if the hypothetical individual would be unable to work in a position in which her head would be static, i.e., held in a fixed position, and she could only occasionally turn her head from side to side and look up and down occasionally. Tr. 72. The VE replied such a limitation would not impact the jobs he identified. Tr. 73. The ALJ asked the VE if his answer would change if the individual would be absent at least three times per month and the VE stated that such a limitation would preclude the work he previously identified. Tr. 73-74.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her August 21, 2015, decision, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through
    December 31, 2017.  Tr. 16.

2.  The claimant has not engaged in substantial gainful activity since February 10, 2012, the
    alleged onset date.  Tr. 16.

3.  The claimant has the following severe impairments: degenerative disc disease of the
    cervical spine, lumbar spine disc herniation, depression, and anxiety.  Tr. 16.

4.  The claimant does not have an impairment or combination of impairments that meets or
    medically equals the severity of one of the listed impairments in 20 CFR Part 404,
    Subpart P, Appendix 1.  Tr. 17.

5.  The claimant has the residual functional capacity to perform sedentary work as defined
    in 20 CFR 404.1567(b) except that she can lift/carry 10 pounds occasionally, stand/walk
    2 hours, and sit for 6 hours with a sit/stand option every hour for 5 minutes.  She can
    balance, and occasionally climb stairs/ramps, but not ladders, ropes, or scaffolds.  She
    can occasionally stoop, kneel, crouch, crawl, and frequently reach in front.  She can
    occasionally reach overhead.  She cannot push or pull with the left upper extremity, but
    she can handle, feel, and finger.  The claimant is precluded from hazards and extreme
    cold.  She can perform simple routine tasks with simple, short instructions, make simple
    decisions, have few workplace changes, and is limited to superficial interaction with
    coworkers, supervisors and the public.  Tr. 19.

6.  The claimant is unable to perform any past relevant work.  Tr. 21.

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations
to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20
C.F.R. § 404.1501 *et seq.*  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to
the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

7. The claimant was born on February 22, 1980 and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 21.

8. The claimant has at least a high school education and is able to communicate in English. Tr. 21.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Tr. 21.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 21.

11. The claimant has not been under a disability, as defined in the Social Security Act, since February 10, 2012, through the date of this decision. Tr. 22.

## V. Parties' Arguments

Although Civitarese's brief is organized in a way that suggest numerous objections to the ALJ's decision, she essentially objects to the ALJ's decision on one ground: the ALJ's treatment of treating physician Dr. Gigliotti's opinion. Doc. 14, pp. 14-27. In response, the Commissioner submits that the ALJ did not err when she considered Dr. Gigliotti's opinion and that her decision is supported by substantial evidence. Doc. 17, pp. 6-19.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984).

## VII. Analysis

Civitarese advances numerous arguments in support of her position that the ALJ erred

when she considered treating physician Dr. Gigliotti's opinion.

### A. The ALJ discussed Civitarese's MRIs and other evidence

Civitarese claims that the ALJ "conspicuously failed to mention the key MRI's in the

record, including a recent October 2014 MRI showing a new disc herniation." Doc. 14, pp. 15-

16, 17, 20. This is incorrect. The ALJ discussed Civitarese's October 2014 MRI showing a

right-sided herniated disc. Tr. 17. The ALJ also discussed Civitarese's January 2012 lumbar and

cervical MRIs. Tr. 17. The ALJ did not discuss Civitarese's February 2012 MRI. However, this

MRI was taken three days before her cervical fusion surgery (Tr. 251-252, 297), which the ALJ

discussed. Tr. 17. Civitarese does not allege that there is any finding in the February 2012

cervical MRI taken three days before her cervical fusion surgery that is relevant to her arguments

challenging the ALJ's treatment of Dr. Gigliotti's opinion. Moreover, the fact that the ALJ

discussed Civitarese's MRI findings in the Step Three portion of her decision and did not

reproduce that discussion when explaining the weight she gave to Dr. Gigliotti's opinion was not

error. *See Crum v. Comm'r of Soc. Sec*., 660 Fed. App'x 449, 457 (6th Cir. Sept. 2, 2016) (The

ALJ was not required to reproduce her discussion of treatment records when explaining the

weight she gave to the treating physician).

Civitarese also complains that the ALJ "ignores the wealth of evidence about the cervical

limitations, and long treatment history, including narcotic prescriptions, pain management and

surgery." Doc. 14, p. 16. It is not clear what Civitarese means by "cervical limitations" that the

ALJ purportedly ignored. The ALJ discussed (and thus did not ignore) Civitarese's long treatment history (Tr. 20, "Longitudinally, claimant has a history of neck pain and left arm weakness before and after surgery."; Tr. 17-18); pain management, including medication; and her surgery (Tr. 17, 20).

### B. The ALJ did not violate the treating physician rule

Civitarese argues that the ALJ violated the treating physician rule when she gave Dr. Gigliotti's opinion less than controlling weight. Doc. 14, p. 15. Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 747 (6th Cir. 2007).

The ALJ gave Dr. Gigliotti's February 16, 2015, opinion "some" weight, finding it inconsistent with the substantial evidence of record. Tr. 20. Specifically, the ALJ observed that Dr. Gigliotti's treatment note dated the same day as his opinion showed that Civitarese had a normal gait, sensations, reflexes, and good to normal muscle strength. Tr. 20. The ALJ also commented that Dr. Gigliotti had previously opined that Civitarese could lift up to ten pounds,

should not lift heavy coin boxes, and that both Drs. Gigliotti and Farber agreed that she should not lift heavy objects as defined by the Department of Labor.[5] Tr. 20. In other words, the severe limitations Dr. Gigliotti assessed Civitarese to have on February 16, 2015, were not supported by the objective exam findings made by Dr. Gigliotti on the same day and were also more restrictive than Dr. Gigliotti's two prior opinions and those of another doctor, Dr. Farber. This evidence cited by the ALJ is inconsistent with Dr. Gigliotti's opinion; thus, the ALJ explained why she did not give controlling weight to Dr. Gigliotti's opinion. *See Wilson*, 378 F.3d at 544 (treating source opinion entitled to controlling weight if the ALJ finds the opinion "well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record.").

Moreover, elsewhere in her decision, the ALJ detailed other evidence of record, including MRI results; visits with pain management Drs. Salama and Rhiew; an x-ray taken after Civitarese's surgery; her longitudinal history of neck pain and arm weakness before and after surgery; examination findings; treatment, including medication; and her complaints of pain. Tr. 17-18, 20. The ALJ commented that, in 2012, Dr. Gigliotti "conceded that [Civitarese's] continuing complaints of left shoulder and left arm pain were out of proportion to the underlying clinical findings" and that pain management specialist Dr. Rhiev opined that her "complaints of left upper extremity pain were inconsistent with the results of [the October 2014] MRI, which showed a right sided herniated disc." Tr. 17. Civitarese does not challenge this evidence. The ALJ did not err when finding that the above evidence did not support Dr. Gigliotti's February 16,

---

[5] The Department of Labor's classification of heavy duty lifting is akin to the DOT and Social Security Regulations: occasionally lifting up to one hundred pounds, frequently up to fifty pounds, and constantly up to twenty pounds. The category below heavy duty, which is medium duty, allows occasional lifting of up to fifty pounds. *See Scott M. Fishman*, Bonica's Management of Pain, p. 1500 (4th ed. 2012), available at http://tinyurl.com/y9cgxf29 (last accessed Dec. 4, 2017); 20 C.F.R. § 404.1567(d) ("Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.").

2015, opinion. In other words, the ALJ gave good reasons for the weight she gave to Dr. Gigliotti's opinion. *See* 20 C.F.R. § 404.1527(c)(2). (If an ALJ decides to give a treating source opinion less than controlling weight, she considers factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole).

Civitarese complains that it was unfair of the ALJ to cite to Dr. Gigliotti's exam findings dated the same day as his opinion, asserting that Civitarese was there that day with a chief complaint of anxiety, not physical complaints. E.g., Doc. 14, pp. 15, 21. Nevertheless, Dr. Gigliotti physically examined Civitarese that day and documented his physical findings (Tr. 553), which he did not always do when she visited (see, e.g., Tr. 550). Furthermore, that day, Civitarese reported "continued" neck pain and "more problems" with her arm and hand and had her disability form for Dr. Gigliotti to fill out. Tr. 551. The fact that Civitarese's chief complaint that day was not her physical pain does not undercut Dr. Gigliotti's examination findings, which were largely normal and, therefore, did not support his opinion that Civitarese was as severely limited as he opined. Civitarese speculates that the ALJ "neglected to account for the possibility of temporary improvement or a lull in symptoms." Doc. 14, p. 21. The ALJ is not required to consider possible reasons explaining objective exam findings, especially when, as here, Civitarese complained to Dr. Gigliotti that day of "continued neck pain" and "having more problems with her left arm and hand." Tr. 551. She did not report to him that she was experiencing a lull in her symptoms. Moreover, Civitarese does not identify other physical exam findings taken by Dr. Gigliotti that she believes support his opinion assessing severe limitations.

Civitarese asserts that the ALJ did not mention the "active problems" section of the treatment note from her visit with Dr. Gigliotti, which lists her diagnoses. Doc. 14, p. 20. But

the ALJ considered Civitarese's diagnoses (Tr. 16) and a list of diagnoses does not equate to a finding of disability.

Civitarese cites other evidence in the record that she believes supports Dr. Gigliotti's opinion. She details her subjective complaints and asserts that her MRIs showed that her disc herniations caused stenosis, fluid displacement and nerve signal loss. Doc. 14, p. 17 (citing Tr. 392, 556). But the MRIs showing stenosis and fluid displacement were pre-surgery (Tr. 393, 252), and the nerve signal loss at C5-6 was post-surgery and was "as would be expected after anterior cervical fusion." Tr. 556. Otherwise, her herniation at C5-6 had been "surgically corrected" and had a "satisfactory appearance." Tr. 556. Doc. 14, p. 17. Moreover, whether there is evidence in the record to support Dr. Gigliotti's opinion is not the issue before the Court. The issue before the Court is whether the ALJ's decision is supported by substantial evidence. It is; therefore, it must be affirmed. *See Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

Finally, Civitarese appears to assert that the ALJ gave more weight to the state agency reviewer's opinion than Dr. Gigliotti's opinion. Doc. 14, pp. 23-24. But the ALJ gave "some" weight to both the state agency reviewer's opinion and Dr. Gigliotti's opinion. Tr. 20. Moreover, the fact that an ALJ gives less weight to a treating physician's opinion than a state agency reviewing physician's opinion is not, standing alone, reversible error. *See* SSR 96-6p, 1996 WL 374180, at *3.

In sum, the ALJ did not violate the treating physician rule when she gave "some" weight to Dr. Gigliotti's opinion.

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**

IT IS SO ORDERED.

Dated: December 21, 2017

Kathleen B. Burke
United States Magistrate Judge